**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CHARLES A. GAINER,**

      **Plaintiff,**

  **v.**

                               **Case No. 2:17-CV-454**
                               **JUDGE EDMUND A. SARGUS, JR.**
                               **Magistrate Judge Chelsey M. Vascura**

**MEGAN J. BRENNAN, POSTMASTER
GENERAL, *UNITED STATES POSTAL
SERVICE*,**

      **Defendant.**

<u>**OPINION AND ORDER**</u>

      This matter is before the Court upon Defendant's Motion for Summary Judgment (ECF No. 37), Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (ECF No. 38), and Defendant's Reply in Support of its Motion for Summary Judgment (ECF No. 39). For the reasons that follow, the Court **GRANTS** Defendant's Motion.

I.

**A. Factual Background**

      Plaintiff Charles Gainer, an African-American male, has been employed by Defendant United States Postal Service ("USPS") since March 20, 1993. (OPF Excerpts, Def.'s Exhibit A[1]). During the relevant period, Mr. Gainer's position of record was Mail Handler. (*Id.*). The duties of a mail handler include "[r]obot operator[,] lettermail induction and some driving[.]" (Pl.'s 2014 EEO Aff., Def.'s Exhibit B, 4).

---

[1] All Defendant's exhibits are located at ECF No. 37.

Pursuant to the USPS handbook, career employees such as Mr. Gainer, can be detailed or temporarily assigned, reassigned, or promoted to another position "[w]hen a career employee is temporarily absent[.] . . . [W]hen the absent employee returns, the applicant returns to the position he or she occupied prior to the temporary assignment." (Miniard Decl., Def.'s Exhibit E, ¶ 4; USPS Handbook, Def's Exhibit G, § 716). Examples of temporary absences that justify filling a position include "[s]erving as a national officer of a postal employee organization." (Exhibit G, § 716(b)).

Temporary assignments are defined as "the placement of an employee into an established position for a limited period of time to perform duties and responsibilities other than those contained in the employee's normal position description. A formal reassignment and/or promotion personnel action is not required." (*Id.* § 716.1). Further, employees in temporary bargaining assignments must meet the qualifications for which they are assigned and the provisions regarding the relevant collective bargaining agreements regarding higher level bargaining assignments must be followed. (*Id.* § 716.11). Details to higher level supervisory positions are referred to as "204b" assignments. (Exhibit E, Letter; CBA Excerpt, Def.'s Exhibit F, 46). On the other hand, "[t]emporary promotion[s] [are] limited to situations where it is impractical to fill a higher-level position by other temporary means. Such situations include, but are not limited to, long-term absences of the incumbent or the need to defer the permanent filling of a position for a lengthy period of time." (Exhibit G, § 716.2). Additionally, "[t]emporary promotions are filled using competitive promotion procedures." (*Id.* § 716.21).

According to the collective bargaining agreement ("CBA") between the USPS and the National Postal Mail Handlers Union ("Union"), "'the duty assignment of a . . . mail handler detailed to . . . a supervisory position [or 204b assignment] . . . in excess of 120 consecutive days

shall be declared vacant and shall be posted'" for other employees to bid on. (Exhibit E, ¶ 7 (quoting CBA Art. 12.3B12)). In this scenario, when a detailed employee is removed from the detail or returns to the position he occupied prior to the temporary assignment, such employee no longer holds the bid position and is designated an unassigned regular. (*Id.* ¶ 8). An unassigned regular receives a fixed schedule but remains fully employed by USPS. (*Id.*). Therefore, to avoid losing a bid position, detailed employees must return to their assigned position ("return to the craft") for a minimum of 14 consecutive days before being re-detailed to another temporary assignment. (*Id.* ¶¶ 8, 9). Additionally, "for details of an anticipated duration of one week . . . or longer to those higher level craft positions enumerated in [the CBA] as being permanently filled on the basis of promotion of the senior qualified employee, the senior, qualified, eligible, available employee in the immediate work area in which the temporarily vacant higher level positions exists shall be selected." (CBA Excerpt, Pl.'s Exhibit 2, § 25.4, ECF No. 38). The CBA describes higher level work as "an assignment to a ranked higher level position[.]" (*Id.* § 25.1). It goes on to explain that "[a]n employee who is detailed to higher level work shall be paid at the higher level[.]" (*Id.* § 25.2).

### 1. 2014 EEO Action

From April 27 through December 13, 2013, Mr. Gainer was detailed to the position of Acting Supervisor. (Exhibit B, 5–6; Exhibit E, Assignment Orders). According to the assignment orders, the Acting Supervisor position was a 204b assignment with an E17 pay grade and a higher level authorization. (Exhibit E, Assignment Orders). Mr. Gainer "returned to the craft" resuming Mail Handler duties from July 29 to August 4, 2013. (Exhibit B, 5). However, on August 4, Mr. Gainer aggravated a preexisting left hip injury on the job and was subsequently out of work for eleven days. (*Id*; Pl.'s Resp. to Def's Interrog., Def.'s Exhibit C, No. 4). Upon

3

his return, Mr. Gainer again assumed the detail of Acting Supervisor from August 16 to December 13, 2013, then again from December 27, 2013 to April 24, 2014, and again from May 8 to May 26, 2014. (Exhibit B, 5, 6). Mr. Gainer resumed Mail Handler duties from December 13 through December 27, 2013 and from April 24 through May 8, 2014. (*Id.*).

On October 23, 2013, the Union filed a grievance requesting to have Mr. Gainer's regular Mail Handler position posted. (2014 Grievance File, Def.'s Exhibit H, Std. Grievance Form). The Union claimed Mr. Gainer had been detailed for more than 120 days without returning to his bid for the requisite 14 consecutive days. (*Id.*). Jill Miniard, USPS Eastern Area Labor Relations Specialist, resolved the grievance, determining that Mr. Gainer's Mail Handler position should be declared vacant and posted for bidding based on Mr. Gainer's PS Form 1723, which showed that he was detailed from April to December 2013 with only a three-day return to the craft from July 31 to August 2, 2013. (Exhibit E, ¶¶ 12, 13, Assignment Orders; Miniard EEO Aff., Def's Exhibit L, 2–3).

On May 28, 2014, Mr. Gainer took medical leave until August 28, 2014 to have hip replacement surgery. (Exhibit B, 5). On July 29, 2014, Ernie Kelly, Mr. Gainer's supervisor at that time, notified him that he was removed from his bid position pursuant to the Union's grievance resolution. (*Id.* at 6). Mr. Gainer returned to work as an "unassigned regular" on September 6, 2014 but was immediately successful in bidding on another Mail Handler position with an M4 pay grade, the same as his previous bid. (*Id.* at 2, 4, 5; Exhibit A; Award Notice, Def.'s Exhibit I).

Mr. Gainer initiated an Equal Employment Opportunity ("EEO") action on September 12, 2014 and subsequently filed his first formal EEO complaint on November 17, 2014. (Pl's 2014 EEO Pre-Compl., Def's Exhibit J, 1; OFO Decision, Def.'s Exhibit N) Mr. Gainer alleged

discrimination based on race and disability when he was removed from his bid position on September 6, 2014. (Exhibit J, 1). Mr. Gainer complained that he was treated differently than a white Mail Handler who called in sick for three days during his 14 days down as a mail handler from his detail assignment and was never removed from his bid. (*Id.* at 1–2; Exhibit B, 7). On May 17, 2017, the Equal Employment Opportunity Commission ("EEOC") affirmed the EEOC Administrative Judge's decision, finding no discrimination by summary judgment. (EEO Decision, Def's Exhibit M; Exhibit N).

### 2. 2016 EEO Action

On September 2, 2016, Mr. Gainer initiated a grievance through the Union. (Pl's 2016 EEO Pre-Compl., Def.'s Exhibit Q, 5; Pl.'s Aff., Pl's Exhibit 1, ¶ 7, ECF No. 38). In the grievance form, the Union summarized what happened as

> MANAGEMENT OFFERED TMS EMPLOYEES IF THEY WANTED TO HAVE THE DETAIL OF BEING THE GROUP LEADER UNTIL NOV. 4, 2016. THE JOB WAS GIVEN TO AN EMPLOYEE THAT IS JUNIOR TO THE GRIEVANT. HE WAS NEVER ASKED IF HE WANTED TO FILL THIS POSITION. ANY HIGHER LEVEL DETAIL OVER 40 HOURS SHOULD BE GIVEN TO THE SENIOR EMPLOYEE IN THAT UNIT PER THE NATIONAL AGREEMENT.

(2016 Grievance File, Def.'s Exhibit P, Grievance Form). Under corrective action requested, the Union stated "MAKE GRIEVANT WHOLE, GIVE HIM THE GROUP LEADER DETAIL AS STATED IN THE NATIONAL AGREEMENT." (*Id.*). However, approximately two months later, the Union voluntarily (and inexplicitly) withdrew the grievance filed on Mr. Gainer's behalf. (Exhibit P, Koller Letter).

After learning the Union withdrew his grievance, Mr. Gainer initiated a second EEO action on October 24, 2016 and subsequently filed his second formal EEO complaint on February 21, 2017. (Exhibit Q, 1; Second Amend. Compl., ¶ 13, ECF No. 30). Mr. Gainer

alleged retaliation for his 2014 EEO action. (Exhibit Q, 1). With the exception of his new supervisor Bridget Neff, Mr. Gainer alleged that the same management officials cited in his new complaint were involved in his prior EEO action. (Pl.'s 2016 EEO Aff., Def.'s Exhibit O, 3). Mr. Gainer claimed Ms. Neff bypassed him for a group leader detail as retaliation for filing his prior EEO complaint. (*Id.* at 4, 5).

According to the assignment order, the group leader detail was a bargaining unit position spanning August 19 through November 4, 2016 with an M5 pay grade, Tuesdays and Wednesdays off, and work hours from 6:00am to 2:50pm. (Exhibit P, Assignment Order). The need for the assignment arose when Mark Bayer, who held the group leader bid job, was off work while serving as Union President. (*Id.*, Supervisor's Narr.). Mr. Gainer stated that he should have been assigned the detail because he was a "senior man with a valid license" and all positions were filled by seniority. (Exhibit O, 5). Instead, Ms. Neff assigned Damon Russell to the detail on August 19, 2016. (Exhibit P, Assignment Order). According to Plaintiff, Mr. Russell was junior to Mr. Gainer in length of service by five years. (Exhibit C, No. 8). At the time of the assignment, both the group leader detail and Mr. Gainer's bid position were the same pay grade with the same hours and days off. (Exhibit A; Exhibit P, Std. Grievance Form, Assignment Order).

According to Ms. Neff, she was not aware that Mr. Gainer had previously filed an EEO complaint at the time the group leader assignment arose. (Neff EEO Aff., Def's Exhibit R, 2). Mr. Gainer alleges that he explicitly told Ms. Neff about his 2014 EEO action during a conversation they had "well prior to the detailing of Russell[.]" (Exhibit 1, ¶ 10). Mr. Gainer claims that after that discussion, Ms. Neff "kept her distance from [him] and generally gave the cold shoulder in the workplace." (*Id.*). In his 2016 EEO Affidavit, question 13 asked "Was/were

the management official(s) you cited in this complaint involved in your prior EEO activity?" to which Mr. Gainer responded "Yes, but now including SDO Bridget Neff." (Exhibit O, 3). The next questions asked "If they were not involved in the prior cases, were they aware of your prior EEO activity, and if so, how and when did they become aware?" and Mr. Gainer responded "Same As Above." (*Id.*). In her EEO affidavit, Ms. Neff affirmatively stated that Gainer's previous EEO activity was not a factor in her assignment decision. (Exhibit R, 6).

Ms. Neff attested that upon her initial assignment to Mr. Gainer's unit as supervisor, Mr. Gainer made it clear to her that he was not interested in any leadership roles. (Exhibit P, Supervisor's Narr.; Exhibit R, 4, 8). However, Mr. Gainer claims that he never made any such statement. (Exhibit 1, ¶ 3). Ms. Neff alleged that it was not until Mr. Gainer got into an altercation with Mr. Russell on August 29, 2016 that he then requested to fill the group leader position. (Exhibit P, Supervisor's Narr.; Exhibit R, 4, 8). Without addressing whether any conflict with Mr. Russell occurred, Mr. Gainer stated that he did not find out about the assignment until August 29, at which time he requested the group leader detail. (Exhibit P, Routing Slip; Exhibit 1, ¶¶ 4, 7).

In her EEO affidavit, Ms. Neff explained that detail assignments were made available to all mail handlers in Mr. Gainer's unit during morning service talks according to normal procedure. (Exhibit R, 5, 6). According to Ms. Neff, the qualifications for such positions were "successful bidder & seniority." (*Id.* at 5). She further explained that "[a]t the time of the complaint, assignments for group leader were given to the willing senior that was present at the service talks[.]" (*Id.* at 8). Ms. Neff stated that she had approached Mr. Gainer about joining the morning service talks prior to the assignment but he refused to attend. (Exhibit P, Grievance Wksht; Exhibit R, 8). Mr. Gainer claimed that he could not attend morning service talks due to

his job duties as a driver. (Exhibit O, 4; Exhibit 1, ¶ 5). However, Mr. Gainer also stated that because "no driver for years come to service talks, they are briefed later." (Exhibit O, 4). During the EEO investigation, Mr. Gainer indicated that he was not aware of any employees being treated differently from him under similar circumstances. (*Id.* at 6).

### B. Procedural History

Mr. Gainer eventually dismissed his 2017 EEO complaint and proceeded with litigation. On June 2, 2017, Mr. Gainer filed a *pro se* complaint against USPS. The complaint was then amended twice by Mr. Gainer's counsel to include three counts: (1) disability discrimination under the Americans with Disabilities Act and/or the Rehabilitation Act, (2) race discrimination in violation of 42 U.S.C. § 2000e–2, and (3) retaliation in violation of 42 U.S.C. § 2000e–3. On February 15, 2019, Defendant moved for summary judgment on all claims. (Def's Mot. for Summ. J., ECF No. 37). Plaintiff filed his *Response in Opposition* on March 7, 2019. (Pl.'s Opp'n, ECF No. 38). On March 20, 2019, Defendant filed its *Reply.* (Def.'s Reply, ECF No. 39). Defendant's *Motion for Summary Judgment* is now ripe for review.

### II.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing USPS's motion for summary judgment, this Court must "view all facts and any inferences in the light most favorable" to Mr. Gainer, the nonmoving party. *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390 (6th Cir. 2009); *see also Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A motion for summary judgment should be denied if "there is a genuine need for trial," which turns on "whether the evidence is such that a reasonable jury could return a verdict for the plaintiff." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375 (6th Cir. 2002).

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]" *Viergutz v. Lucent Technologies, Inc.*, 375 Fed. Appx. 482, 485 (6th Cir. 2010) (internal quotations omitted). Instead, the party opposing summary judgment "must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine need for trial." *Id.*

### III.

In Counts I and II of the complaint, Mr. Gainer claims he was discriminated against by Defendant "in being displaced from his Mail Handler M-04 position because of his medical conditions and/or limitations" and his race. (Second Amend. Compl., ¶¶ 15, 21). Mr. Gainer points to the same set of facts in alleging both instances of discrimination. In Count III of the complaint, Mr. Gainer claims that he was retaliated against for filing the EEO complaint that provides the underlying factual basis for Counts I and II. (*Id.* ¶ 25).

In its *Motion*, USPS generally argues that Mr. Gainer cannot provide evidence supporting a *prima facie* case of disability discrimination, racial discrimination, or retaliation or that there were legitimate, non-discriminatory reasons for the claimed adverse actions. In his *Response*, Mr. Gainer states that he "will only be basing his case upon being retaliated against for filing a prior Charge of Discrimination by not being assigned to the Temporary Group Leader position in August of 2016 and will limit his facts and legal argument to that incident." (Pl's Opp'n, at 1). Mr. Gainer argues that he established a *prima facie* case for retaliation and Defendant's legitimate, non-discriminatory reasons for the claimed adverse actions are pretextual. Finding that Plaintiff concedes Counts I and II, the Court **GRANTS** Defendant's Motion for Summary Judgment on those claims. The Court now addresses the remaining retaliation claim.

9

Title VII of the Civil Rights Act of 1964 prohibits retaliation against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" in connection with an allegedly unlawful employment practice. 42 U.S.C. § 2000e–3(a). Where no direct evidence of retaliation exists,[2] the court applies the familiar three step burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The initial burden rests with the plaintiff to establish a *prima facie* case. *Id.* at 802.

To set forth a *prima facie* case of retaliation a plaintiff must demonstrate that "(1) [he] engaged in a protected activity, (2) [his] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Rogers v. Henry Ford Health System*, 897 F.3d 763, 775 (6th Cir. 2018) (internal quotations omitted). Moreover, "[t]o establish causation, [a plaintiff] must proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Alexander v. Ohio State Univ. Coll. of Soc. Work*, 429 Fed. Appx. 481, 489 (6th Cir. 2011) (internal quotations omitted). If Mr. Gainer meets his *prima facie* burden, "the burden shifts to Defendant[] to articulate some legitimate, [non-retaliatory] reason for the action." *Id.* (internal quotations omitted). If Defendant is able to articulate such a reason, Plaintiff "must demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for [retaliation]." *Id.* (alteration in original, internal quotations omitted).

In the case at bar, Defendant does not dispute that Mr. Gainer engaged in a protected activity by filing an EEO complaint in September 2014 and that USPS was aware of Mr.

_____

[2] Plaintiff does not dispute that there is no direct evidence of retaliation. (Pl. Opp'n, at 6).

Gainer's filing—although there is disagreement regarding whether Mr. Gainer's supervisor in 2016 was aware of the prior protected activity. (Def.'s Mot. for Summ. J., at 30 n. 11). It is the final two elements, regarding a materially adverse action and a causal connection between the protected activity and the adverse action, that are in dispute.

## A. Materially Adverse Action

"[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 64 (2006). Actions that are "typically construed as nonmaterial" can also "rise to the level of an adverse employment action when considered in context." *Taylor v. Geithner,* 703 F.3d 328, 336 (6th Cir. 2013). Instead, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse" or in other words, that "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (internal quotations omitted). However, even under the more lenient standard set forth in *White*, an individual is not protected from all retaliation, "but from retaliation that produces an injury or harm." *Id.* at 67.

### 1. Group Leader Position was not a "Promotion"

Plaintiff contends that USPS acted adversely toward him when they "denied a promotion that the CBA required him to receive without any need for him to apply." (Pl.'s Opp'n, at 5). Defendant argues that the group leader position was not a "promotion" but "it was in reality only a temporary detail, which was necessarily of only limited duration." (Def.'s Reply, at 9).

The assignment order specified that the group leader job was a bargaining unit position starting on August 19, 2016 and ending on November 4, 2016, with an M5 pay grade, Tuesdays

11

and Wednesdays off, and work hours from 6:00am to 2:50pm, which arose due to Mark Bayer serving as Union President. (Exhibit P, Assignment Order, Supervisor's Narr.). In his affidavit, Mr. Gainer described the group leader position as a "Temporary Group Leader position" or "Temporary Group Leader assignment." (Exhibit 1, ¶¶ 4, 6, 7). Further, in his 2016 EEO affidavit and complaint, he referred to the position throughout as a "detail" or "assignment." (Exhibit O, 3, 4; Exhibit Q, 4). Additionally, Ms. Neff referred to the group leader position as a "detail assignment" throughout the EEO investigation. (Exhibit P, Supervisor's Narr.; Exhibit R, 5).

In Plaintiff's prior Acting Supervisor roles, the assignment orders clearly specified that the positions were 204b assignments with a higher level authorization and a different (presumably higher) pay grade. (Exhibit E). Further, the Collective Bargaining Agreement defines "higher level work" as "an assignment to a ranked higher level position[.]" (Exhibit 2, § 25.1). While nothing in the group leader assignment order labeled the position as "higher level" or "204b," in their grievance filed on Mr. Gainer's behalf (and later withdrawn), the Union characterized the position interchangeably as both a "higher level detail" and a "group leader detail." (Exhibit P, Std. Grievance Form). Additionally, under corrective action requested, the Union stated "GIVE [GAINER] THE GROUP LEADER DETAIL AS STATED IN THE NATIONAL AGREEMENT." (*Id.*). However, the only time "promotion" was used to describe the position throughout the case is in Plaintiff's *Response in Opposition.*

Similar to the Union's initial grievance, Plaintiff claims that he was automatically entitled to receive the temporary group leader position pursuant to Article 25 of the CBA based on being a "senior man with a valid license." (Exhibit O, 3, 5). Or in other words, there was no competitive promotion procedure necessary to fill the position, just seniority. Thus, Plaintiff's

own contention that he was not required to compete for the position provides that the group leader detail was by definition not a temporary "promotion" but a temporary bargaining assignment that may have been considered "higher level" for purposes of filling the position. (*See* Exhibit G, §§ 716, 716.11, 716.2, 716.21; Exhibit 2, § 25.4)

### 2. No Evidence of Injury or Harm

Mr. Gainer does not allege any injury or harm resulting from Ms. Neff's failure to give him the temporary group leader assignment. Rather, in his *Response in Opposition* he argues that the position would have led to "a step up in responsibility" and that the detail "may have led to even better things[.]" (Pl.'s Opp'n, at 9).

In the employment discrimination context, this Court has held that "[f]ailure to obtain temporary work assignments with no increase in salary and no change in work hours does not amount to an adverse employment action." *Swann v. Time Warner Entertainment Co., L.P.*, 126 F. Supp. 3d 973, 983 (S.D. Ohio 2015); *see also Berryman v. SuperValu Holdings, Inc.,* No. 05CV169, 2010WL1257836, at *13 (S.D. Ohio Mar. 31, 2010) (finding insufficient evidence of an adverse employment action where plaintiff pointed to no evidence that the temporary reassignment she failed to receive would have included a salary or work hour change); *Hillman v. Green Bay Packaging, Inc.*, No. 05CV320, 2006WL3524385, at *13 (S.D. Ohio Dec. 6, 2006) (finding no adverse action where "[p]laintiff has presented no evidence showing that she lost pay or benefits as a result of being passed over for the temporary assignments").

Similarly, the Sixth Circuit held that reassignment of plaintiff to another unit did not constitute a materially adverse action to support his retaliation claim where it did not result in "significantly different responsibilities, a change in benefits, or any other negative effect." *Hunter v. Secretary of U.S. Army*, 565 F.3d 986, 996–97 (6th Cir. 2009). The court went on to

explain that an involuntary transfer lacking such evidence did not result in the "injury or harm" that the Supreme Court required in the retaliation context. *Id. Cf. White*, 548 U.S. at 71 (explaining that where "the jury had before it considerable evidence that the track laborer duties were 'by all accounts more arduous and dirtier'; that the 'forklift operator position required more qualifications, which is an indication of prestige': and that 'the forklift operator position was objectively considered a better job and the male employees resented [the plaintiff] for occupying it[,]'" reassignment to track laborer from forklift operator would have been materially adverse). Likewise, in *Harris v. Butler County, Ohio ex. Rel. its Sheriff's Dept,* the court held that a temporary delay (two to three months) in the plaintiff receiving his special commission did not constitute an adverse action in a claim for retaliation where the special commission did not entitle the plaintiff to additional pay but only allowed him to perform special detail assignments. 344 Fed. Appx. 195, 199 (6th Cir. 2009).

Additionally, the District Court for the District of Columbia has addressed temporary details in the retaliation context head-on under the same "relatively low bar" set out in *White*.[3] *Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584, 596 (6th Cir. 2007). In *Brookens v. Solis*, the court concluded that denial of a temporary detail generally does not constitute an adverse action. 616 F. Supp. 2d 81, 91 (D.D.C. 2009); *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002) (holding that interference with, delay, or denial of a temporary designation is not an adverse employment action under Title VII). However, the court also stated that "[n]on-selection for a temporary position can constitute an adverse action if the position would have provided some tangible and objective benefit." *Kangethe v. District of Columbia*, 206 F. Supp.

---

[3] In determining the scope of the antiretaliation provision in Title VII, the Supreme Court noted that "[w]e agree with the formulation set forth by the Seventh and District of Columbia Circuits" with regard to whether a challenged action is materially adverse. *White*, 548 U.S. at 67.

14

3d 661, 670 (D.D.C. 2016). But "generalized and speculative assertions of benefits that may accrue from a temporary post are insufficient." *Id; Maramark v. Spellings,* No. 06-5099, 2007WL2935411, at \*1 (D.C. Cir. Sep. 20, 2007) (noting that the denial of a five-month detail that might have allowed plaintiff to secure a new permanent position was too speculative to constitute an "objectively tangible harm"); *see also Morales-Vallellanes v. Potter*, 605 F.3d 27, 38 (1st Cir. 2010) (holding that a temporary rotation of job responsibilities does not qualify as an adverse action for purposes of plaintiff's retaliation claim where there was no evidence that the temporary job duties "were more difficult, less prestigious, or objectively inferior").

Whether a "higher level" detail or not semantically, there is no dispute that unlike Plaintiff's previous 204b assignments, the temporary group leader position offered the same pay, work hours, and days off as Mr. Gainer's bid position in August 2016. (Exhibit A; Exhibit P, Std. Grievance Form, Assignment Order). Mr. Gainer also fails to point to any other benefit that he would have received had he been given the temporary group leader detail or any negative effect he experienced from not being assigned to the position. While materially adverse actions in the retaliation context are not limited to a change in the terms and conditions of Plaintiff's employment, the record is likewise void of any detrimental change in Mr. Gainer's personal circumstances, relationships, or expectations as a result of the failure to assign him the detail. *See White*, 548 U.S. at 69 (noting that for example, an involuntary change in an employee's schedule who is a working mother with young children or a supervisor's refusal to invite an employee to a weekly training lunch that contributes significantly to the employee's professional advancement may deter those employees from complaining about discrimination).

Further, the only evidence in the record that provides any insight into the job responsibilities of the temporary group leader position is the generic definition of "temporary

assignment" in the USPS employee handbook—"duties and responsibilities other than those contained in the employee's normal position description." (Exhibit G, § 716.1). But in order for the action to be materially adverse there must be more than "an alteration of job responsibilities." *Johnson v. Donahoe*, 642 Fed. Appx. 599, 603 (6th Cir. 2016) (internal quotations omitted). Offering only conclusory allegations in the *Response in Opposition* that the position would have led to "a step up in responsibility" and that the detail "may have led to even better things" is not sufficient to establish a genuine issue of fact without supporting evidence. (Pl.'s Opp'n, at 9); *see Coffey v. Chattanooga-Hamilton County Hosp. Authority*, No. 98-6230, 1999WL824870, at *4 (6th Cir. Oct. 6, 1999) ("'[C]onclusory allegations and subjective beliefs . . . are wholly insufficient evidence' to defeat a motion for summary judgment."); *Wilson v. Brennan*, 213 F. Supp. 3d 934, 949 (S.D. Ohio 2016) (explaining that conclusory arguments alone are insufficient to support the existence of an adverse action).

There is also no evidence that historically any of Mr. Gainer's previous temporary assignments led to these speculative results. From April 2013 to May 2014, Mr. Gainer was detailed as an Acting Supervisor for several months on four different occasions. (Exhibit B, 5). After each assignment, Plaintiff returned back to his bid position as a mail handler with an M4 pay grade or bid on another Mail Hander position with an M4 pay grade. (Exhibit A; Exhibit B, 2, 4, 5; Exhibit I). Moreover, up through May 23, 2018 at least, Mr. Gainer continued to be employed as a mail handler with USPS. (Second Amend. Compl., ¶ 5; Exhibit A). *Cf. Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1259 (11th Cir. 2012) (noting that withholding a position that an employee would otherwise receive under company policy may be materially adverse when it results in the employee no longer having a job). Even under the "less onerous" standard for retaliation claims, a reasonable juror could not conclude that Ms. Neff's failure to

assign Mr. Gainer the temporary group leader position constituted a materially adverse action. *Johnson,* 642 Fed. Appx. at 603.

### B. Causal Connection

Assuming arguendo that USPS's failure to assign Mr. Gainer the group leader detail did rise to the level of a materially adverse action, Plaintiff also has the burden of showing a causal connection. To demonstrate a causal connection under the fourth prong, a plaintiff must produce sufficient evidence from which an inference can be drawn that an adverse employment action would not have been taken had he not engaged in the protected activity. *Hicks v. SSP America, Inc.,* 490 Fed. Appx. 781, 785 (6th Cir. 2012.)

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.,* 516 F.3d 516, 525 (6th Cir. 2008). Otherwise, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* "[O]ther indicia of retaliatory conduct would include evidence that the plaintiff was treated differently, either less positively or more negatively, than similarly situated employees who had not exercised Title VII rights . . . or evidence that the plaintiff was subjected to closer disciplinary scrutiny after exercising Title VII rights." *Evans v. Prospect Airport Services, Inc.,* 286 Fed. Appx. 889, 895 (6th Cir. 2008).

Initially, the parties disagree as to the relevant period of time for the temporal proximity analysis. In his *Response in Opposition,* Plaintiff does not contend that the time between the September 2014 EEO action and the August 19, 2016 group leader assignment establishes an

17

inference of retaliation. (Def.'s Mot. for Summ. J., at 33-34); *see Lahar v. Oakland County*, 304 Fed. Appx. 354, 359 (6th Cir. 2008) (holding that "a five-month gap in time does not by itself suffice to get to a jury on causation"). Rather, Plaintiff argues that the Court should look at the time between Mr. Gainer and Ms. Neff's alleged discussion regarding his 2014 complaint and Ms. Neff's failure to detail Mr. Gainer to the group leader position in August 2016, as the appropriate measure of time.

Even if the Court agrees with Mr. Gainer that the relevant starting point for a temporal proximity analysis is the date he claims he discussed his 2014 EEO charge with Ms. Neff, that date is unclear. Mr. Gainer has the burden at this stage to point to evidence in the record indicating that temporal proximity exists from which a jury could infer causation. *Bruno v. RBS Citizens, NA*, No. 16CV245, 2017WL2336008, at *10 (S.D. Ohio May 30, 2017). There is no evidence in the record demonstrating when this discussion took place or even approximately how long before August 19, 2016 this conversation occurred, other than "well prior to the detailing of Russell[.]" (Exhibit 1, ¶ 10). While the Sixth Circuit has instructed that causation may be inferred from timing alone when the adverse employment action occurs very close to the protected activity, temporal proximity alone is not sufficient in the absence of affirmative evidence as to when the discussion between Ms. Neff and Mr. Gainer occurred. *Bruno*, 2017WL2336008, at *10.

Mr. Gainer's argument, however, does not rest on temporal proximity alone. Instead, Plaintiff points to Ms. Neff's "immediate adverse change" towards him following their alleged discussion as evidence of retaliatory conduct. (Pl.'s Opp'n, at 6). Plaintiff claims Ms. Neff "kept her distance" and "generally gave [Mr. Gainer] the cold shoulder in the workplace" after they discussed his 2014 EEO complaint. (Exhibit 1, ¶ 10).

In *Fischer v. United Parcel Service, Inc.*, 390 Fed. Appx. 465, 468–69 (6th Cir. 2010), both sides presented evidence that the plaintiff and his supervisor had a cordial, productive, communicative relationship followed by plaintiff's supervisor acting cold and distant toward him after the protected activity, which was corroborated by two other employees. The Sixth Circuit held that this constituted sufficient evidence of retaliatory conduct *in conjunction with* other evidence, including that after the protected activity the plaintiff received heightened scrutiny, the supervisor restricted plaintiff exclusively to his office, and the plaintiff's supervisor demanded to know his whereabouts at all times, which none of the other employees experienced. *Id; see also Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001) (noting sufficient evidence of retaliatory animus where plaintiff was disciplined on several occasions when others were not for the same conduct and where a fellow employee recounted meetings where she and other co-workers were requested to make false claims against the plaintiff or lose their jobs)*; Moore v. KUKA Welding Systems*, 171 F.3d 1073, 1080 (6th Cir. 1999) (finding sufficient retaliatory conduct where the supervisor intentionally isolated plaintiff from other employees, frequently disciplined plaintiff for trivial matters, and unfairly criticized plaintiff's work). *But see Bruno, 2017WL2336008*, at *11 (finding insufficient evidence of retaliatory conduct where defendant asked plaintiff to reschedule a vacation and was stricter about requiring plaintiff to make up missed time after her sex discrimination complaint).

In contrast, Plaintiff does not provide any corroborating evidence from other witnesses regarding his observations nor does he describe Ms. Neff's demeanor towards him before the alleged conversation. Further, there is no evidence that Mr. Gainer endured any heightened scrutiny by Ms. Neff or that he was treated differently than other employees. *See Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436–37 (6th Cir. 2009) (finding increased scrutiny of plaintiff's

19

work critical in conjunction with temporal proximity of three months in establishing causation); *Evans,* 286 Fed. Appx. at 896 (noting that plaintiff failed to point to disciplinary actions or lack thereof against other employees for similar conduct to allow for a comparison in determining there was no evidence of retaliatory conduct). In fact, Mr. Gainer asserted that he was not aware of any disparate treatment between himself and other employees by Ms. Neff. (Exhibit O, 6). Mr. Gainer's subjective and uncorroborated observations about Ms. Neff's attitude toward him on their own cannot reasonably be categorized as retaliatory. *See Bruno,* 2017WL2335008, at *11 (explaining that conclusory allegations of harassment or scrutiny are insufficient to create a genuine issue of fact as to the causal connection element of a retaliation claim). Thus, Plaintiff has failed to produce sufficient evidence for a jury to reasonably infer a causal connection between either his 2014 EEO action or his alleged discussion about this protected activity with Ms. Neff and Ms. Neff's failure to assign him the group leader detail.

Because Plaintiff has failed to meet his burden in establishing a *prima facie* case of retaliation under Title VII, the Court **GRANTS** USPS's Motion for Summary Judgment on Count III.

## IV.

Based on the foregoing, the Court concludes that, even when believing Mr. Gainer's evidence and drawing all justifiable inferences in his favor, no reasonable jury could find in his favor on any of his claims. The Court, therefore, **GRANTS** Defendant's *Motion for Summary Judgment*. (ECF No. 37.) The Clerk is **DIRECTED** to **ENTER JUDGMENT** accordingly.

**IT IS SO ORDERED.**

5-14-2019

**DATE**

EDMUND A. SARGUS, JR.
CHIEF UNITED STATES DISTRICT JUDGE